IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

KEVIN PATRICK BUKER, et al.,      *

              Plaintiffs      *

         vs.      *      CIVIL ACTION NO. MJG-13-3046
                       (Consolidated with MJG-13-3747)
HOWARD COUNTY, et al.,      *

             Defendants      *

*      *      *      *      *      *      *      *      *

MEMORANDUM DECISION RE: SUMMARY JUDGMENT
AS TO PLAINTIFF BUKER

In the Order Re: Summary Judgment Motions, [Document 45],
pertaining to Plaintiffs' § 1983 claims,[1] the Court granted the
Defendants summary judgment as to Plaintiff Kevin Patrick Buker
("Buker") and denied the Defendants summary judgment as to
Plaintiff Mark Grutzmacher ("Grutzmacher").

The instant Memorandum Decision states the grounds for
granting summary judgment with regard to Buker.  By separate
Memorandum Decision Re: Summary Judgment as to Plaintiff
Grutzmacher issued herewith, the Court states the grounds for
denying Defendants summary judgment with regard to Grutzmacher.

---

[1]     Plaintiffs' facial challenge claims are the subject of a
pending summary judgment motion.

## I.   BACKGROUND

On January 20, 2013, Buker, a Battalion Chief in the Emergency Services Bureau of Defendant Howard County, Maryland Department of Fire and Rescue Services (the "Fire Department"), posted a statement on his Facebook wall to which Grutzmacher responded.  Buker then "liked" (i.e. adopted) Grutzmacher's posting.  Thereafter, as discussed herein, there were additional pertinent postings by Buker.

Buker contends that he was fired in retaliation for his Facebook postings in violation of his First Amendment free speech rights.  By their [First] Motion for Summary Judgment [Document 28],[2] Defendants sought summary judgment on Plaintiffs' First Amendment retaliation claims pursuant to Federal Rule of Civil Procedure 56.

## II.   SUMMARY JUDGMENT STANDARD

A motion for summary judgment shall be granted if the pleadings and supporting documents "show[] that there is no genuine dispute as to any material fact and the movant is

---

[2]   Defendants' [Second] Motion for Summary Judgment, [Document 40], remains pending.  The Second Motion is addressed to Plaintiffs' facial challenge to the Fire Department's Social Media Guidelines and Code of Conduct.  The Court will issue a separate Memorandum and Order Re: Summary Judgment as to Defendants' Second Motion.

entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

The well-established principles pertinent to summary judgment motions can be distilled to a simple statement:  The Court may look at the evidence presented in regard to a motion for summary judgment through the non-movant's rose-colored glasses, but must view it realistically.  After so doing, the essential question is whether a reasonable fact finder could return a verdict for the non-movant or whether the movant would, at trial, be entitled to judgment as a matter of law.  See, e.g., Celotex Corp. v. Catrett, 477 U.S. 317, 322-323 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Shealy v. Winston, 929 F.2d 1009, 1012 (4th Cir. 1991).

Thus, in order "[t]o defeat a motion for summary judgment, the party opposing the motion must present evidence of specific facts from which the finder of fact could reasonably find for him or her." Mackey v. Shalala, 43 F. Supp. 2d 559, 564 (D. Md. 1999) (emphasis added).  However, "self-serving, conclusory, and uncorroborated statements are insufficient to create a genuine issue of material fact."  Int'l Waste Indus. Corp. v. Cape Envtl. Mgmt., Inc., 988 F. Supp. 2d 542, 558 n.11 (D. Md. 2013); see also Wadley v. Park at Landmark, LP, 264 F. App'x 279, 281 (4th Cir. 2008).

When evaluating a motion for summary judgment, the Court
must bear in mind that the "[s]ummary judgment procedure is
properly regarded not as a disfavored procedural shortcut, but
rather as an integral part of the Federal Rules as a whole,
which are designed 'to secure the just, speedy and inexpensive
determination of every action.'"  <u>Celotex</u>, 477 U.S. at 327
(quoting Fed. R. Civ. P. 1).


III.  <u>DISCUSSION</u>

    A.  <u>"Facts"</u>[3]

The Fire Department is arranged in a hierarchical chain-of-
command led by the Fire Chief.  Three Deputy Chiefs, including
the Deputy Chief of Operations, report directly to the Fire
Chief.  Below the Deputy Chiefs in the chain-of-command are the
Assistant Chiefs.  The Assistant Chief of the Emergency Services
Bureau and the Assistant Chief of the Administrative Bureau
report to the Deputy Chief of Operations.  Below the Assistant
Chiefs are the Battalion Chiefs.  Goddard Dep. 21:17-24.

At all times relevant hereto, Defendant William F. Goddard,
III ("Goddard") was Fire Chief, Defendant John S. Butler
("Butler") was Deputy Chief of Operations, Defendant William
Anuszewski ("Anuszewski") was Assistant Chief of the
Administrative Services Bureau, and Defendant John Jerome

---

[3]    For summary judgment purposes.

("Jerome") was Assistant Chief of the Emergency Services Bureau,
which oversees the delivery of fire and medical services.

Buker joined the Fire Department in 1997 as a recruit.
Buker Dep. 9:21-24.  During the entire course of his employment,
he worked as a paramedic.  Id. 12:23-13:3.  At all times
relevant hereto, Buker was a Battalion Chief assigned to the
Second Battalion of the Emergency Services Bureau in charge of
one of three eight-hour shifts (for a total of twenty-four
hours).  Id. 12:14-22; Goddard Dep. 206:6-13.


    1.   Fire Department's Social Media Guidelines and
        Facebook

On November 5, 2012, the Fire Department issued its Social
Media Guidelines (the "Policy").  [Document 28-4].  The Policy
states, in pertinent part:

> 3.4 Personnel are prohibited from posting or
> publishing any statements, endorsements, or
> other speech, information, images or
> personnel matters that could reasonably be
> interpreted to represent or undermine the
> view or positions of the Department Howard
> County, or officials acting on behalf of the
> Department or the County . . . .
>
> . . . .
>
> 3.6 Personnel shall refrain from posting or
> publishing statements, opinions or
> information that might reasonably be
> interpreted as discriminatory, harassing,
> defamatory, racially or ethnically
> derogatory, or sexually violent when such
> statements, opinions or information, may

> place the Department in disrepute or
> negatively impact the ability of the
> Department in carrying out its mission.
>
> . . . .
>
> 3.8 Personnel are prohibited from posting on
> any social media site or electronically
> transmitting messages, images, comments or
> cartoons displaying threatening or sexually-
> explicit material, epithets or slurs based
> on race, ethnic or national origins, gender,
> religious affiliation, disability, sexual
> orientation, or harassing, offensive,
> discriminatory, or defamatory conduct.

[Document 28-4] at 4.

The Policy applies to Fire Department personnel "whether on or off duty." Id. at 1. As part of the Policy implementation, Jacqueline Kotei, the Fire Department's Public Information Officer, and Fadra Nally, an independent digital media strategist, met with the Battalion Chiefs, including Buker, "to introduce how [the Fire Department] wanted to roll the guidelines out in a way that would be embraced by the department" and to get feedback from the Battalion Chiefs. Nally Dep. 44:21-45:10, 113:4-21. During the meeting, Buker only expressed his concern about having a Fire Department photographer on site at emergency scenes. Id. 114:17-25.

The Policy covers Fire Department personnel activity on social networking sites, including Facebook. [Document 28-4] at 1. At all times relevant hereto, Buker maintained a Facebook account under the name "Kevin Buker." Buker's Facebook friends

included employees of the Fire Department and other public safety agencies, as well students from an EMT (emergency medical technician) class that he taught.  Buker Dep. 15:4-16:13.  Buker set his Facebook privacy settings such that only his "friends" – and not the general public on Facebook – could view his Facebook activity.  See [Document 28-16] at 1.

Buker did not list the Fire Department as his employer on his Facebook page.  However, he posted photographs of himself in uniform participating in the Fire Department's Honor Guard at a parade during a firemen's convention and "tagged" himself in one of the photographs.  Buker Dep. 59:6-61:12, 68:11-18; [Document 28-9].  Buker's Facebook page also contained photographs of him teaching EMT classes, including one of him sitting in front of a cake that read "Thank You Chief Buker."  Buker Dep. 56:22-58:25; [Document 28-10] at 12.  Moreover, Buker's family members "tagged" him in at least two photographs congratulating him on his promotion to Battalion Chief.  [Document 28-6] at 135-36.


2.   January 20, 2013[4] Facebook Posts and Reactions

On the afternoon of Sunday, January 20, Buker was in his office at the Second Battalion at the Fire Department working and watching news coverage of the gun control debate.  [Document

---

[4]   All dates herein are in the year 2013 unless otherwise indicated.

28-16] at 1.  At 2:33 PM, Buker posted the following statement

on his Facebook page:

> My aide had an outstanding idea . . lets
> (<u>sic</u>) all kill someone with a liberal . . .
> then maybe we can get them outlawed too!
> Think of the satisfaction of beating a
> liberal to death with another liberal . . .
> its (<u>sic</u>) almost poetic . . .

[Document 28-11] at 2; [Document 28-16] at 1.

Twenty minutes later, at 2:53 PM, Grutzmacher wrote the

following comment on Buker's Facebook wall:

> But . . . was it an "assault liberal"?
> Gotta pick a fat one, those are the "high
> capacity" ones.  Oh . . . pick a black one,
> those are more "scary".   Sorry had to
> perfect on a cool Idea!

[Document 28-11] at 3-4.

At 2:59 PM, Buker "liked" Grutzmacher's comment and posted

the following statement: "Lmfao![5]  Too cool Mark Grutzmacher!"

[Document 28-11] at 4.

On January 22, First Battalion Chief Robert Utz ("Utz"),

who worked the same shift as Buker, sent a screenshot of Buker's

initial Facebook post to Assistant Chief Jerome with a message

that stated: "Chief, not sure this is something that should be

displayed from one of our battalion chiefs."  [Document 28-11]

at 1.

---

[5]     "Laughing my f***ing ass off."

Jerome forwarded the message to Assistant Chief Anuszewski and Deputy Chief Butler.  [Document 28-12] at 1.  Butler emailed the screenshot to Fire Chief Goddard, who responded "Let's make sure we snapshot their posts."  [Document 28-12] at 4.  Butler informed Goddard via email that "Many other inappropriate comments were made re Buker's posting, by others from within the [fire] dept.  No one above the FF [firefighter] rank though."  [Document 28-12] at 4.

Lieutenant Bruce Bennett, vice-president of the local firefighters union, testified at his deposition that in the days following the January 20 Facebook posts, "[t]here was lots of talk and chatter in the field from everybody that had seen the posts" and that "it was running rampant through the department." Bennett Dep. 41:22-42:6.  For instance, members of the Phoenix Sentinels, the Howard County affiliate of the International Association of Black Professional Firefighters, contacted Battalion Chief Louis Winston ("Winston") after seeing the January 20 Facebook posts.  Winston Dep. 30:13-31:12.  Winston called Butler because a senior member of the Phoenix Sentinels had expressed concern that Grutzmacher's "comment of picking a black one referred to a black person."  Winston Dep. 30:15, 34:10-21.  The same firefighter also expressed to Winston that he "had concerns with having to work for [Buker]," even though

at the time, the firefighter was not working directly under
Buker. Id. 30:10-25.

On January 22 at 7:16 PM, Assistant Chief Jerome sent an
email to Buker at his Fire Department email address that stated:

> It has come to my attention that you may
> have an inappropriate Facebook post posted
> in your account. I am asking that you take a
> look at your recent posts and take down what
> you feel might not be consistent with
> Department social media policy.
>
> Please let me know when accomplished.

[Document 28-13] at 3.

The following afternoon, Buker replied:

> Pretty vague. I am in compliance with the
> Social Media policy. However, an employee who
> formerly had access to my timeline (since
> rectified) recently complained about being
> offended by a post. While I believe it meets
> the Policy dictates, I have deleted both the
> comment and the employee to prevent further
> complains or misunderstandings. . . .

Id.

### 3.   January 23 Facebook Posts and Reactions

On January 23, the same afternoon on which he informed
Jerome he had removed the original January 20 post, Buker posted
the following statement on his Facebook page:

> To prevent future butthurt and comply with a
> directive from my supervisor, a recent post
> (meant entirely in jest) has been deleted.
> So has the complaining party. If I offend
> you, feel free to delete me. Or converse
> with me. I'm not scared or ashamed of my
> opinions or political leaning, or religion.

10

> I'm happy to discuss any of them with you.
> If you're not man enough to do so, let me
> know, so I can delete you. That is all.
> Semper Fi! Carry on.

[Document 28-14] at 2.  The post received at least 40 "likes."

In response to a comment from a Facebook friend asking "As long as it isn't about the FD, shouldn't you be able to express your opinions?", Buker replied below the first January 23 post:

> Unfortunately, not in the current political
> climate. Howard County, Maryland, and the
> Federal Government are all Liberal Democrat
> held at this point in time. Free speech only
> applies to the liberals, and then only if it
> is in line with the liberal socialist
> agenda. County Government recently published
> a Social media policy, which the Department
> then published it's [sic] own. It is
> suitably vague enough that any post is
> likely to result in disciplinary action, up
> to and including termination of employment,
> to include this one. All it took was one
> liberal to complain . . . sad day. To lose
> the First Amendment rights I fought to
> ensure unlike the WIDE majority of the
> Government I serve.

Id. (alteration in original).  Another Facebook friend of Buker's commented: "Oh, your [sic] gonna get in trouble for saying that too," to which Buker replied: "Probably. . ." Id. (alteration in original).

On the afternoon of January 24, then-Captain Joe Calo[6] of the Special Projects Section of the Administrative Services Bureau emailed a screen shot of Buker's January 23 Facebook

---

[6]     Later promoted to Battalion Chief on February 11, 2013. Calo Dep. 15:14-25.

posts to Fire Chief Goddard with the comment "[p]osting once he was requested to take it down." [Document 28-15] at 1. Calo emailed Fire Chief Goddard and Assistant Chief Anuszewski a "Buker Summary," in which he noted that Buker escalated the situation "when he was advised to remove the [January 20] posting. Could've complained about having to remove it and aired his displeasure but instead he became insubordinate toward mgmt. [and g]ave metaphorical middle finger." [Document 28-18] at 1. Calo suggested that the incident "be treated like any other investigation [and d]isciplinary action should be determined after the conclusion of the investigation." Id.

Fire Chief Goddard responded to Calo:

> Make sure we have snapshots of those pictures and posts that reflect [Buker's] relationship to the [Fire Department], if any. If there are no such pictures or posts that tie him to HCDFRS [Howard County Department of Fire and Rescue Services], he has the right to express his opinions and I will not support any further actions or considerations by the Department.

[Document 28-15] at 3.

The following day – January 25 – the Fire Department moved Buker out of field operations and into an administrative assignment pending the results of the Fire Department's internal investigation by Battalion Chief Timothy Diehl ("Diehl"). [Document 28-19] at 3. Diehl interviewed Buker on January 29 at the Fire Department Headquarters. Id. Buker also provided the

12

Fire Department with a written statement, in which he wrote that

he "fully, completely meant [the January 20 post] as a joke"

that "was not intended to offend per se." [Document 28-16].

Buker's statement did not reference his January 23 posts.

On February 5, Assistant Chiefs Anuszewski and Jerome gave

Buker permission to use the Fire Department's training facility

to hold a previously scheduled session with his EMT class.

[Document 30-32] at 2. The class was sponsored by the Maryland

Fire and Rescue Institute, not the Fire Department, and Buker

was not acting as an agent of the Fire Department when he taught

the class. Jerome Aff. ¶¶ 4-10.


        4.   February 17 Facebook Posts and Termination of
             Buker's Employment

On February 17, 2013, Mike Donnelly, a member of the

Elkridge, Maryland Volunteer Fire Department, posted a

photograph on his Facebook page of an elderly woman with her

middle finger raised. Butler Dep. 122:16-123:8; [Document 28-

17] at 1. The photograph contained the following message:

                   THIS PAGE, YEAH THE ONE
                 YOU'RE LOOKING AT IT'S MINE
                   I'LL POST WHATEVER THE
                       FUCK I WANT.

[Document 28-14] at 1. Above the photograph, Donnelly wrote,

"for you Chief." Id. Buker, who was Facebook friends with

Donnelly, "liked"[7] the post.  Id.; [Document 28-8] at 5.  Buker,

and at least one other Fire Department employee, understood that

Donnelley's post "was in support of me," i.e., Buker.  Buker

Dep. 111:7-22; Godar Dep. 19:6-11.

As a result of Donnelly's February 17 Facebook post, the

Fire Department made Donnelly a "nonoperational" volunteer,

which meant that he was still permitted to be a member of the

Elkridge Volunteer Fire Department – an independent non-profit

organization – but he was not permitted to wear a Fire

Department uniform or ride on a Fire Department truck.  Butler

Dep. 121:24-123:8.

On February 25, 2013, Buker was served with Charges of

Dismissal from Fire Chief Goddard, which stated that the Fire

Department intended to terminate Buker's employment effective

March 6.  [Document 28-19] at 1.  Under "Events Giving Rise to

My Decision," Goddard discussed all three sets of Facebook posts

---

[7]    At least one other Fire Department employee - Cassandra
"Casey" Godar ("Godar") - also 'liked' the post.  [Document 28-
17] at 3.  Godar was disciplined by the Fire Department for
violating the Policy.  Butler Dep. 118:19-119:6.  She testified
at her deposition that she "had to apologize to Chief Goddard
for apparently offending him, and that was the end of it."
Godar Dep. 17:17-19.  The parties have not presented any
evidence of the position Godar holds in the Fire Department.
    In addition, Grutzmacher commented under the picture: "Hey.
. . . I could use that!"  [Document 28-17].  However, the Fire
Department already had terminated his volunteer service five
days earlier on February 12.  [Document 28-22].

- from January 20, January 23, and February 17.  Id. at 1-3.

Under "Analysis of Investigative Findings," he wrote:

> You also do not seem to understand that your
> actions reflect poorly on the Department and
> the County. . . .
>
> Failure to grasp the impact and implications
> of your comments is exacerbated by the fact
> that you hold a leadership position within
> the Department as a Battalion Chief . . .
> responsible for enforcing Departmental
> policies and taking appropriate action for
> violations of those policies by the people
> you supervise. If you fail to recognize what
> conduct violates those policies, you cannot
> be expected to take appropriate and
> effective action with those you supervise
> and/or manage.
>
> However, what causes the greatest concern is
> your repeated insolence and insubordination.
> Upon receiving the directive to remove the
> original post, instead of discretely
> removing it, you angrily replaced it with
> another posting tirade mocking the Chain-of-
> Command, the Department, and the County.
> . . .
>
> Again, your insubordination is further
> exacerbated by the fact that, as a Battalion
> Chief, you are expected and required to
> serve as an example . . . Your conduct
> seriously impacts operations because it
> disrupts the lines of authority and
> undermines the Chain-of-Command. . . .

Id. at 3-4.  The Charges of Dismissal stated that Buker's

proposed dismissal was based on a finding that he had violated

the Policy, along with the Howard County Code's provisions

against Insubordination, Violation of County Policy, and

Misconduct.  Goddard wrote: "I find your justifications for your

15

behavior neither sufficient nor acceptable.  Your repeated and

continued insubordination and your lack of understanding is

inappropriate for a public safety officer of your tenure and

rank." Id. at 7.

Buker attended a pre-termination hearing on March 8.

[Document 28-21] at 5.  On March 14, Fire Chief Goddard issued

his final decision terminating Buker's employment.  Id.


B.  Legal Standard

Buker contends that the Defendants violated his First

Amendment rights to free speech by terminating his employment in

retaliation for his exercising those rights.

Speech by public employees receives less constitutional

protection than speech by private citizens.  See Garcetti v.

Ceballos, 547 U.S. 410, 418 (2006).  However, "[s]o long as

employees are speaking as citizens about matters of public

concern, they must face only those speech restrictions that are

necessary for their employers to operate efficiently and

effectively." Id. at 419.

To determine whether a public employee has stated a First

Amendment claim for retaliatory discharge, a court must

determine:

> (1)  whether   the   public   employee   was
>      speaking as a citizen upon a matter of

> public concern or as an employee about
> a matter of personal interest;
>
> (2)   whether the employee's interest in
>       speaking upon the matter of public
>       concern outweighed the government's
>       interest in providing effective and
>       efficient services to the public; and
>
> (3)   whether the employee's speech was a
>       substantial factor in the employee's
>       termination decision.

McVey v. Stacy, 157 F.3d 271, 277-78 (4th Cir. 1998); see also

Connick v. Myers, 461 U.S. 138, 147-48 (1983).

"The inquiry into the protected status of speech is one of

law, not fact." Connick, 461 U.S. at 148 n.7. The employee

bears the burden of demonstrating that he was speaking as a

citizen on a matter of public concern. See Brooks v. Arthur,

685 F.3d 367, 371 (4th Cir. 2012).

"Whether an employee's speech addresses a matter of public

concern must be determined by the content, form, and context of

a given statement . . . ." Connick, 461 U.S. at 147-48. The

United States Courts of Appeals for the Fourth Circuit has

stated:

> [T]he "public concern" or "community
> interest" inquiry is better designed—and
> more concerned—to identify a narrow spectrum
> of employee speech that is not entitled even
> to qualified protection than it is to set
> outer limits on all that is. The principle
> that emerges is that all public employee
> speech that by content is within the general
> protection of the first amendment is
> entitled to at least qualified protection
> against public employer chilling action

> except that which, realistically viewed, is
> of purely "personal concern" to the
> employee—most typically, a private personnel
> grievance.

Berger v. Battaglia, 779 F.2d 992, 998 (4th Cir. 1985).  Put
more simply, "'[s]peech involves a matter of public concern when
it involves an issue of social, political, or other interest to
a community.'  This does not include 'personal complaints and
grievances about conditions of employment.'"  Durham v. Jones,
737 F.3d 291, 299-300 (4th Cir. 2013) (citations omitted).

Once the employee demonstrates that his speech was on a
matter of public concern, the court must balance "the interests
of the [employee], as a citizen, in commenting upon matters of
public concern and the interest of the State, as an employer, in
promoting the efficiency of the public services it performs
through its employees."  Pickering v. Bd. of Ed. of Twp. High
Sch. Dist. 205, Will Cnty., Ill., 391 U.S. 563, 568 (1968).

"Whether the employee's interest in speaking outweighs the
government's interest is a question of law for the court."
Smith v. Gilchrist, 749 F.3d 302, 309 (4th Cir. 2014).
"Regarding this balancing, the government bears the 'burden of
justifying the discharge on legitimate grounds.'"  Id., 749 F.3d
at 309 (quoting Rankin v. McPherson, 483 U.S. 378, 388 (1987)).

The Pickering balancing test requires a court "to consider
the context in which the speech was made, including the

employee's role and the extent to which the speech impairs the

efficiency of the workplace." Id.  Factors relevant to this

inquiry include whether a public employee's speech:

> (1)  impaired the maintenance of discipline by supervisors;
>
> (2)  impaired harmony among coworkers;
>
> (3)  damaged close personal relationships;
>
> (4)  impeded the performance of the public employee's duties;
>
> (5)  interfered with the operation of the institution;
>
> (6)  undermined the mission of the institution;
>
> (7)  was communicated to the public or to coworkers in private;
>
> (8)  conflicted with the responsibilities of the employee within the institution; and
>
> (9)  abused the authority and public accountability that the employee's role entailed.

Ridpath v. Bd. of Governors Marshall Univ., 447 F.3d 292, 317

(4th Cir. 2006).  The government employer is not required "to

prove that the employee's speech actually disrupted efficiency,

but only that an adverse effect was 'reasonably to be

apprehended.'"  Maciariello v. Sumner, 973 F.2d 295, 300 (4th

Cir. 1992) (citation omitted).  However, paying mere "lip

service," without "articulat[ing] any way in which the office

[environment] would have been different or was actually different due to [a plaintiff's] statements," is not sufficient to tip the scale in favor of the government employer.  See Durham v. Jones, 737 F.3d 291, 302 (4th Cir. 2013).

If the court determines that the employee's interest in speaking on a matter of public concern outweighs the employer's interest in providing efficient service, then "the court turns to the factual question of 'whether the employee's speech was a substantial factor in the employee's termination decision.'" Brooks, 685 F.3d at 371.  The employee bears the burden of demonstrating the causal relationship.  Ridpath, 447 F.3d at 318.

"The causation requirement is 'rigorous' in that the protected expression must have been the 'but for' cause of the adverse employment action . . . ."  Ridpath v. Bd. of Governors Marshall Univ., 447 F.3d 292, 318 (4th Cir. 2006); see also Jurgensen v. Fairfax Cnty., Va., 745 F.2d 868, 881 (4th Cir. 1984).  However, "[t]he employer may nevertheless rebut the showing [that the protected speech was a substantial factor in the termination] by proof that it would have discharged the plaintiff 'even in the absence of the protected conduct.'" Stroman v. Colleton Cnty. Sch. Dist., 981 F.2d 152, 156 (4th Cir. 1992) (quoting Mount Healthy City Bd. of Educ. v. Doyle, 429 U.S. 274, 287 (1977).

C.    January 20 Facebook Posts

The content and effect of each of the January 20 Facebook posts is attributable to Buker, regardless of who "authored" the post and who "liked" it.  See Bland v. Roberts, 730 F.3d 368, 386 (4th Cir. 2013), as amended (Sept. 23, 2013) ("On the most basic level, clicking on the 'like' button literally causes to be published the statement that the User 'likes' something, which is itself a substantive statement.").

1.    McVey Prong #1 - Public Concern v. Personal Interest

The content, form, and context of the January 20 Facebook posts indicate that they were speech on a matter of public concern – the gun control debate – and not private interest.[8]

Whether they were intended as jokes[9] or as satire,[10] the January 20 posts are vastly different from the unprotected

---

[8]    "Whether a statement is made as an employee or as a citizen is a question of law." Graziosi v. City of Greenville Miss., 775 F.3d 731, 736 (5th Cir. 2015).  The Supreme Court has "h[e]ld that when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes." Garcetti v. Ceballos, 547 U.S. 410, 421 (2006).  There is no evidence that making statements on Facebook was within the ordinary scope of Buker's duties as a Battalion Chief.  Moreover, the January 20 posts did not refer to any Fire Department practices or policies.  Accordingly, the Court holds that Buker's January 20 Facebook posts were speech as a citizen.  See Graziosi, 775 F.3d at 737; Duke v. Hamil, 997 F. Supp. 2d 1291, 1300 (N.D. Ga. 2014).

[9]    In a statement given during the Fire Department's investigation, Buker wrote: "This joke occurred to me while

21

speech present in the cases relied upon by Defendants.  For

instance, in Mitchell v. Hillsborough County, 468 F.3d 1276

(11th Cir. 2006), the Eleventh Circuit concluded that a county

employee's comments at a public meeting about a commissioner's

"'preoccupation with other women's vaginas'" was not speech on a

matter of public concern.  Id. at 1285.  The court explained

that "[c]omprised solely of sophomoric name-calling and

contempt-communicating expressive acts, there is nothing in the

content of Mitchell's speech that communicated anything of value

watching and working. . . . I fully, completely meant it as a
joke." [Document 28-16] at 1.  That Buker initially
characterized his post as a "joke" is relevant to whether the
post was speech on a matter of public concern, but it is not
necessarily dispositive.  Cf. Shepherd v. McGee, 986 F. Supp. 2d
1211, 1221 (D. Or. 2013) ("[W]hile the subjects of tax credits
or the use of government resources or entitlement programs are
arguably matters of public concern, Plaintiff's comments did not
strike at the heart or core of the First Amendment given her own
characterization of them as 'humorous and ironic' and 'joke[s]'.
As such, they are more on the periphery of First Amendment
protection because they were banter rather than speech intended
to help the public actually evaluate the performance of a public
agency." (alteration in original) (internal citation omitted)).
[10]  Grutzmacher testified at his deposition that when he saw
Buker's initial post, "I took it as satire when I read it
initially.  I viewed it as a literal impossibility."
Grutzmacher Dep. 50:2-11.  He explained that he "took [the post]
to understand that . . . if they want to get things as the
liberal government, quote/unquote, banned because of something
silly like a cosmetic feature, then maybe we can get those
people banned for something silly as well."  Id. 51:2-14.  The
"use of satire to comment on a matter of public concern d[oes]
not deprive [an individual] of the protection afforded by the
first amendment."  See Muller v. Fairfax Cnty. Sch. Bd., 878
F.2d 1578, 1583 (4th Cir. 1989).

to a matter of public concern. Instead, content-wise, Mitchell's speech, could only be viewed as a personal attack . . . ." Id.

Moreover, the posts were not the kinds of jokes or pranks that courts have found to be unprotected speech. See, e.g., Robinson v. Jones, No. 3:02CV1470 (CFD), 2006 WL 726673, at *3 (D. Conn. Mar. 20, 2006) ("[The] 'speech' involved placing an election-related bumper sticker on Warden Brian Murphy's state car. . . . The Court finds that Robinson's joke or prank was personal in nature and does not qualify as protected public speech."); Martinez v. Del Re, No. 98 C 5841, 2001 WL 1104639, at *4-5 (N.D. Ill. Sept. 18, 2001) ("Absent any content that does not relate to matters of social or political import, and brought forth in the context of the 'Wall of Shame' and other lampoons, it cannot be fairly said that these postings address any topic of public concern.").

The January 20 Facebook posts differ in content, form, and context from other Facebook posts that courts have determined to be outside, or on the periphery of, First Amendment protection. In In re O'Brien, No. A-2452-11T4, 2013 WL 132508 (N.J. Super. Ct. App. Div. Jan. 11, 2013) (per curiam), the court agreed that a public school teacher's Facebook post stating "'I'm not a teacher—I'm a warden for future criminals!'" was not addressed to a matter of public concern, but instead was "a personal statement, driven by her dissatisfaction with her job and

23

conduct of some of her students." Id. at *4. Similarly, in
Shepherd v. McGee, 986 F. Supp. 2d 1211, (D. Or. 2013), the
court stated that a Department of Human Services case worker's
Facebook posts, including, inter alia, "'So today I noticed a
Self-Sufficiency client getting into a newer BMW. What am I
doing wrong here? I think I need to quit my job and get on
[public assistance],'" were "more on the periphery of First
Amendment protection because they were banter rather than speech
intended to help the public actually evaluate the performance of
a public agency." Id. at 1214-15;[11] see also Graziosi v. City of
Greenville Miss., 775 F.3d 731, 739 (5th Cir. 2015) ("[T]he
context weighs against a finding that she spoke on a matter of
public concern. Graziosi made the [Facebook] posts immediately
after returning to work from an unrelated suspension.
Furthermore, when making the posts, she admits that she was
angry with Chief Cannon . . . and concedes that . . . her posts
were 'inappropriately intense.'").

---

[11]    But see Shepherd v. McGee, 986 F. Supp. 2d 1211, 1217 (D.
Or. 2013) ("The parties dispute whether Plaintiff's posts
constitute speech on a matter of public concern. I need not
resolve that issue or whether Plaintiff spoke as a private
citizen or public employee because even assuming that the
Facebook posts were speech on a matter of public concern and
that Plaintiff spoke as a private citizen, I nonetheless grant
summary judgment to Defendant because he has shown as a matter
of law that DHS had an adequate justification for its
termination decision." (internal footnote omitted)).

Instead, the January 20 Facebook posts more closely resemble the Facebook posts found to be protected speech in <u>Duke v. Hamil</u>, 997 F. Supp. 2d 1291 (N.D. Ga. 2014).  In <u>Duke</u>, a deputy chief at a university police department was demoted after posting a picture of the Confederate flag on Facebook and commenting "'It's time for the second revolution'" shortly after the conclusion of the 2012 presidential election.  <u>Id.</u> at 1293. The court concluded that the deputy's "speech can be fairly considered to relate to matters of political concern to the community because a Confederate flag can communicate . . . various political or historical points of view.  Combine this symbol with a statement calling for a revolution right after an election, and it is plausible that Plaintiff was expressing his dissatisfaction with Washington politicians." <u>Id.</u> at 1300.  The court also emphasized that the deputy "expressed no grievances related to the Department's policies or his colleagues." <u>Id.</u>

Like the Facebook posts at issue in <u>Duke</u>, the January 20 posts constituted speech on a matter of public concern – the gun control debate - and, more specifically, the proposed assault weapons ban.  Buker wrote in his Fire Department statement that he made the initial post after watching Sunday news coverage concerning gun control, assault weapons, and gun violence.  <u>See</u> [Document 28-16].  Just as the officer in <u>Duke</u> did not literally want to start a revolution, Buker did not support literally

25

"beating a liberal to death with another liberal."  Moreover,
other Fire Department employees expressed their understanding
that the January 20 posts were political statements.  See, e.g.,
Bennett Dep. 63:10-13 ("[T]his was in people's minds – First
Amendment rights, Second Amendment rights, social media
policies, you know, all of those things intertwined . . . .");
Breznak Dep. 21:2-3 ("I understood it was a political statement,
yes."); Nally Dep. 57:5-9 ("Q : With respect to the Grutzmacher
post, do you understand this to be a political statement?  A:
Political in that it is specifically about gun control, yes.").

Even though the phrases "beating a liberal to death" and
"black one, those are more 'scary'" may be offensive or
distasteful, "[t]he inappropriate or controversial character of
a statement is irrelevant to the question whether it deals with
a matter of public concern."  Rankin v. McPherson, 483 U.S. 378,
387 (1987); see also Duke, 997 F. Supp. 2d at 1300.

The Court concludes that Buker's speech on January 20 was
him speaking as a citizen on a matter of public concern and not
as an employee about a matter of personal interest.

2.   McVey Prong #2 – Balancing Buker's Interest in
     Speech and Fire Department's Interest in Service

Once an employee demonstrates that his speech was on a
matter of public concern, the court must balance "the interests

26

of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." Pickering v. Bd. of Ed. of Twp. High Sch. Dist. 205, Will Cnty., Ill., 391 U.S. 563, 568 (1968).

Defendants contend that, even if the January 20 Facebook posts involved matters of public concern, "the Fire Department's interest in minimizing disruption outweighed any minimal First Amendment interest [Buker] claim[s] to have in the[] Facebook posts." [Document 28-1] at 2.

"The debate over the propriety of gun control legislation is, obviously, a matter of public concern." Thomas v. Whalen, 51 F.3d 1285, 1290 (6th Cir. 1995). However, the Fourth Circuit has stated that "fire departments[] provide such essential services and depend so much on good working relations within the department that we place a premium on the government's interest as we conduct the Pickering balancing test." Mills v. Steger, 64 F. App'x 864, 872 (4th Cir. 2003).

Courts "give[] substantial weight to government employers' reasonable predictions of disruption . . . ." Waters v. Churchill, 511 U.S. 661, 673 (1994). Moreover, it is not necessary "for an employer to allow events to unfold to the extent that the disruption of the office and the destruction of

working relationships is manifest before taking action."
Connick, 461 U.S. at 152.

"[A] public employee, who has a confidential, policymaking,
or public contact role and speaks out in a manner that
interferes with or undermines the operation of the agency, its
mission, or its public confidence, enjoys substantially less
First Amendment protection than does a lower level employee."
McVey, 157 F.3d at 278.  Because Buker was a Battalion Chief
with key leadership responsibilities, his speech has the unique
potential to offend others and interfere with the operation and
mission of the Fire Department.

Fire Chief Goddard testified at his deposition that a
Battalion Chief "is the most critical leadership position in the
organization" because Battalion Chiefs "manage the day-to-day
operations of the field, of all of our emergency services" and
"direct the day-to-day enforcement of our policies and
procedures – with our first responders that are out there every
day."  Goddard Dep. 203:8-14, 206:14-17.  Goddard explained that
Battalion Chiefs "understand the procedures because they're the
ones that have to actually implement those procedures[, and]
have to answer the questions of those that they supervise, which
are critical because those decisions that are made in the field
certainly have the potential if not followed to lead to some
tragic consequences."  Id. 203:23-204:6.

The content and form of the January 20 Facebook posts arguably "are controversial, divisive, and prejudicial," and [b]ecause these potentially offensive messages came from [an individual high up in] the Department's [chain-of]-command, [the Fire Department] did not have to wait to see if the controversy affected the discipline, mutual respect, or trust among the [employees Buker] supervised before addressing it." See Duke, 997 F. Supp. 2d at 1301, 1303 (concluding that the Defendant police department's "interests outweigh [the Deputy Chief's] interest in speaking"). "Given [Buker]'s supervisory responsibilities, such speech could undermine 'loyalty, discipline, [and the] good working relationships among the [Fire Department's] employees' if left unaddressed." Id. at 1302 (citation omitted).

"When close working relationships are essential to fulfilling public responsibilities, a wide degree of deference to the employer's judgment is appropriate." Connick, 461 U.S. at 151-52. Defendants have presented evidence of actual – or at least the potential for – internal unrest within the Fire Department as a result of the January 20 Facebook posts. For instance, Bennett testified at his deposition that after Buker made the January 20 Facebook posts, "it was like a whirlwind. Hey, you know, Chief Buker, did you see the post. It was running rampant out in the department across all three shifts.

It did not take long for everybody in the department to know."
Bennett Dep. 60:15-23.

Winston testified at his deposition that a senior member of
the Howard County affiliate of the International Association of
Black Professional Firefighters contacted him expressing concern
that the "comment of picking a black one referred to a black
person" and "with having to work for [Buker]," even though at
the time, the firefighter was not working directly under Buker.
Winston Dep. 30:10-25, 34:10-21.  In addition, Lieutenant John
Breznak ("Breznak") testified at his deposition that when he saw
the January 20 posts, he thought there was a "double standard"
at play.  He testified that he "had recently been . . .
disciplined for using a euphemism while on duty [during what he]
thought [was] a private conversation with [Buker]" and he felt
that he "was disciplined and held to one standard [and] didn't
understand why [Buker] wasn't held the same way."  Breznak Dep.
22:18-24:8.  Breznak also testified that at least two other
firefighters saved a screenshot of the January 20 posts to use
as "ammunition" in the event that were disciplined by the Fire
Department so that he could say to the Department "well, if I'm
in trouble, then how could this [post from Buker] not be taken
as being wrong as well."  Id.  17:23-19:24.

Moreover, it was reasonable, based on the contents of the
January 20 posts and the comments from other firefighters, for

30

the Fire Department to think that Buker's posts could negatively impact the public's perception of the Department and interfere with its ability to protect the public safety.  Buker did not have the Fire Department listed as his employer on his Facebook page, but it was clear from other content on the page – which included, <u>inter</u> <u>alia</u>, photographs of Buker marching in a parade in his Honor Guard uniform and teaching EMT classes - that he was affiliated with the Fire Department.  And, even though Buker set his Facebook privacy settings such that only his Facebook friends could view his Facebook activity, "his choice to place [the posts] on a social media platform risked sharing [them] with a much broader audience."  <u>Duke</u>, 997 F. Supp. 2d at 1303.

Calo testified at his deposition that "community trust" is an essential element of the Fire Department's public service mission – "We walk into homes in the middle of the night.  We are alone in rooms with property small enough to stick in your pocket.  The community must trust that we are aboveboard and we are there for service." Calo Dep. 151:5-152:4.  He testified that the Fire Department was concerned with the impact of the January 20 posts on "African American peers, civilians, citizens, everybody" because "we don't ever want to give the impression, ever that we have bias in any way."  <u>Id.</u> 149:15-150:10.  Because Buker was a Battalion Chief in the Fire Department, "his conduct reflected on the Department's

31

reputation more significantly than the conduct of other officers," and it is possible that "many in the community would take offense to his chosen form of speech, not just because they disapprove of it, but because it raises concerns of [his] prejudice—and the Department's."  Duke, 997 F. Supp. 2d at 1302.

The Court finds that the Pickering balancing test tips in favor of the Fire Department because Buker's January 20 Facebook posts were "capable of impeding the [Fire Department]'s ability to perform its duties efficiently."  Id.  Accordingly, Defendants are entitled to summary judgment on Buker's First Amendment retaliation claims.[12]

---

[12]     Because the Court finds that Defendants are entitled to summary judgment based upon the Pickering balancing test, it need not proceed to the third prong of McVey, whether the January 20 Facebook posts were the "but for" cause of the termination of Buker's employment.

However, in the interest of completeness, the Court will briefly address causation as it relates to the January 20 posts. Buker has not demonstrated that the January 20 Facebook posts were the "but for" cause of his termination.  The evidence indicates that after the January 20 posts, and even after the January 23 posts, the Fire Department was not contemplating termination of Buker's employment.  For instance, in the initial assessment of the "Buker issue" submitted to Fire Chief Goddard, written after the January 20 and 23 posts but before the February 17 post, Calo noted that there were "3 lines in the sand – first poor judgment (counseling), then racial overtones (suspension), finally insubordination (demotion)."  [Document 28-18].  Moreover, even though the Charges of Dismissal reference the January 20 posts, Fire Chief Goddard wrote that "what causes the greatest concern is [the] repeated insolence and insubordination" stemming from the January 23 and, more significantly, February 17 posts.  [Document 28-19] at 4.

Accordingly even assuming that Buker prevailed on the Pickering balancing test, the Court still would grant summary

D.   January 23 and February 17 Facebook Posts

Even if Buker's interest in making the January 20 Facebook posts had outweighed the Fire Department's interests in promoting respect, trust, and efficiency and protecting the public, Defendants would, nevertheless, be entitled to summary judgment because the January 23 and February 17 Facebook posts were not protected speech and constituted insubordination.

The content, form, and context of the January 23 and February 17 Facebook posts indicate that they focused primarily on allegations of personal mistreatment and not on broader policy concerns.

In the January 23 posts, Buker wrote, inter alia:

> To prevent future butthurt and comply with a directive from my supervisor, a recent post (meant entirely in jest) has been deleted.
>
> County Government recently published a Social media policy, which the Department then published it's [sic] own. It is suitably vague enough that any post is likely to result in disciplinary action, up to and including termination of employment, to include this one. All it took was one liberal to complain . . . sad day.

[Document 28-14] at 2 (alteration in original).

Although the January 23 posts discuss the Policy and reference First Amendment rights, they were made in the context

_____

judgment to Defendants as to the January 20 Facebook posts because they were not the but for cause of Buker's termination.

33

of the Fire Department's disciplinary investigation into Buker's posts. See Graziosi v. City of Greenville, 985 F. Supp. 2d 808, 813 (N.D. Miss. 2013) ("Graziosi's comments to the Mayor, although on a sensitive subject, were more related to her own frustration of Chief Cannon's decision not to send officers to the funeral and were not made to expose unlawful conduct within the Greenville Police Department.  Her posts were not intended to help the public actually evaluate the performance of the GPD. (internal footnote omitted), aff'd sub nom. Graziosi v. City of Greenville Miss., 775 F.3d 731 (5th Cir. 2015).

The January 23 posts were a direct response to Assistant Chief Jerome's email to Buker regarding the January 20 posts and were disputing the application of the Policy to Buker's posts. "When employee speech concerning office policy arises from an employment dispute concerning the very application of that policy to the speaker, additional weight must be given to the supervisor's view" that the employee's speech addresses a private dispute and not an issue of public concern.[13] Connick, 461 U.S. at 153.

---

[13]    Even if the January 23 Facebook posts could be considered to be speech on a matter of public concern, "[t]he limited first amendment interest here does not require that [Buker]'s employers tolerate associated behavior that they reasonably believed was disruptive and insubordinate." Dwyer v. Smith, 867 F.2d 184, 194 (4th Cir. 1989).

On February 17, Buker "liked" Donnelly's Facebook post,
which had "for you Chief" written above a photograph of an
elderly woman with her middle finger raised with the message
"THIS PAGE, YEAH THE ONE YOU'RE LOOKING AT[.] IT'S MINE[.] I'LL
POST WHATEVER THE FUCK I WANT." [Document 28-14] at 1.  This
post clearly was not speech on a matter of public concern.  It
did not contain a political message, did not speak to a matter
of broad policy, and did not expose a wrongdoing.  Instead, it
was a reference to the Fire Department's investigation of Buker.

There is no evidence in the record that Buker spoke as a
citizen on a matter of public concern when he made the January
23 or February 17 Facebook posts.  "Rather, the record reveals
that [Buker] made increasingly hostile statements about
managerial decisions he found disagreeable or unwise. Such
speech was not entitled to First Amendment protection. Rather,
it was wholly unprotected insubordination that" the Fire
Department was not required to tolerate.  McReady v. O'Malley,
804 F. Supp. 2d 427, 440 (D. Md. 2011).

Buker argues that "Defendants created their own cause
celebre by instructing Mr. Buker to remove the First Buker Post"
because "[b]ut for Defendants' initial and illegal instruction
to remove the First Buker post, Mr. Buker's subsequent posts
would have never occurred." [Document 30-1] at 42-43.  However,
he provides no legal support for his contention that his January

35

23 and February 17 speech is to be considered protected speech
and, in effect, "immunized" because his January 20, 2013 speech
was protected speech.


IV.   CONCLUSION

        The instant Memorandum Decision sets forth the reasons that
Defendants' Motion for Summary Judgment [Document 28] was
GRANTED as to Plaintiff Buker.



        SO ORDERED, on Wednesday, May 27, 2015.


                              _____/s/_____
                                   Marvin J. Garbis
                              United States District Judge