IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

KEVIN PATRICK BUKER, et al.,          *

            Plaintiffs          *

        vs.          *          CIVIL ACTION NO. MJG-13-3046
                               (Consolidated with MJG-13-3747)
HOWARD COUNTY, et al.,          *

           Defendants          *

*          *          *          *          *          *          *          *          *

MEMORANDUM DECISION RE: SUMMARY JUDGMENT
AS TO PLAINTIFF GRUTZMACHER

In the Order Re: Summary Judgment Motions, [Document 45], pertaining to Plaintiffs' § 1983 claims,[1] the Court granted the Defendants summary judgment as to Plaintiff Kevin Patrick Buker ("Buker") and denied the Defendants summary judgment as to Plaintiff Mark Grutzmacher ("Grutzmacher").

The instant Memorandum Decision states the grounds for denying summary judgment with regard to Grutzmacher.  By separate Memorandum Decision Re: Summary Judgment as to Plaintiff Buker issued herewith, the Court states the grounds for granting Defendants summary judgment with regard to Buker.

---

[1]     Plaintiffs' facial challenge claims are the subject of a pending summary judgment motion.

I.    BACKGROUND

In January 2013, Grutzmacher was an unpaid volunteer with the Howard County, Maryland Department of Fire and Rescue Services (the "Fire Department") who responded to ambulance calls as an emergency medical technician ("EMT").  On January 20, 2013, Buker, a Battalion Chief in the Emergency Services Bureau, posted a statement on his Facebook wall to which Grutzmacher responded.[2]  Grutzmacher, by his Complaint,[3] contends that his volunteer service was terminated in retaliation for his January 20, 2013 postings in violation of his First Amendment free speech rights.

By their [First] Motion for Summary Judgment [Document 28],[4] Defendants sought summary judgment on Plaintiffs' First Amendment retaliation claims pursuant to Federal Rule of Civil Procedure 56.

_____

[2]    As discussed in the Memorandum Decision Re: Summary Judgment as to Plaintiff Buker, Buker made additional Facebook postings pertinent to his claims but not pertinent to Grutzmacher's claims.

[3]    [Document 1] in MJG-13-3747.

[4]    Defendants' [Second] Motion for Summary Judgment, [Document 40], remains pending.  The Second Motion is addressed to Plaintiffs' facial challenge to the Fire Department's Social Media Guidelines and Code of Conduct.  The Court will issue a separate Memorandum and Order Re: Summary Judgment as to Defendants' Second Motion.

II.   SUMMARY JUDGMENT STANDARD

A motion for summary judgment shall be granted if the pleadings and supporting documents "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

The well-established principles pertinent to summary judgment motions can be distilled to a simple statement:  The Court may look at the evidence presented in regard to a motion for summary judgment through the non-movant's rose-colored glasses, but must view it realistically.  After so doing, the essential question is whether a reasonable fact finder could return a verdict for the non-movant or whether the movant would, at trial, be entitled to judgment as a matter of law. See, e.g., Celotex Corp. v. Catrett, 477 U.S. 317, 322-323 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Shealy v. Winston, 929 F.2d 1009, 1012 (4th Cir. 1991).

Thus, in order "[t]o defeat a motion for summary judgment, the party opposing the motion must present evidence of specific facts from which the finder of fact could reasonably find for him or her." Mackey v. Shalala, 43 F. Supp. 2d 559, 564 (D. Md. 1999) (emphasis added).  However, "self-serving, conclusory, and uncorroborated statements are insufficient to create a genuine issue of material fact." Int'l Waste Indus. Corp. v. Cape

3

Envtl. Mgmt., Inc., 988 F. Supp. 2d 542, 558 n.11 (D. Md. 2013);
see also Wadley v. Park at Landmark, LP, 264 F. App'x 279, 281
(4th Cir. 2008).

When evaluating a motion for summary judgment, the Court
must bear in mind that the "[s]ummary judgment procedure is
properly regarded not as a disfavored procedural shortcut, but
rather as an integral part of the Federal Rules as a whole,
which are designed 'to secure the just, speedy and inexpensive
determination of every action.'"  Celotex, 477 U.S. at 327
(quoting Fed. R. Civ. P. 1).


III. DISCUSSION

A.    "Facts"[5]

1.    Fire Department's Social Media Guidelines

On November 5, 2012, the Fire Department issued its Social
Media Guidelines (the "Policy").  [Document 28-4].  The Policy
states, in pertinent part:

> 3.4 Personnel are prohibited from posting or
> publishing any statements, endorsements, or
> other speech, information, images or
> personnel matters that could reasonably be
> interpreted to represent or undermine the
> view or positions of the Department, Howard
> County, or officials acting on behalf of the
> Department or the County . . . .
>
> . . . .

---

[5]    For summary judgment purposes.

4

> 3.6 Personnel shall refrain from posting or publishing statements, opinions or information that might reasonably be interpreted as discriminatory, harassing, defamatory, racially or ethnically derogatory, or sexually violent when such statements, opinions or information, may place the Department in disrepute or negatively impact the ability of the Department in carrying out its mission.
>
> . . . .
>
> 3.8 Personnel are prohibited from posting on any social media site or electronically transmitting messages, images, comments or cartoons displaying threatening or sexually-explicit material, epithets or slurs based on race, ethnic or national origins, gender, religious affiliation, disability, sexual orientation, or harassing, offensive, discriminatory, or defamatory conduct.

[Document 28-4] at 4.

The Policy applies to Fire Department personnel "whether on or off duty." Id. at 1. As a Fire Department volunteer, Grutzmacher was subject to the Policy. Anuszewski Dep. 13:4-13. Defendant Assistant Chief William Anuszewski ("Anuszewski") testified at his deposition that "[t]here's no rank associated with county volunteers who are at the firefighter level." Anuszewski Dep. 12:19-24. Anuszewski also testified that volunteers cannot rise above the firefighter level. Id. 12:25-13:3.

2.    <u>January 20, 2013[6] Facebook Posts</u>

The Policy covers Fire Department personnel activity on social networking sites, including Facebook.  [Document 28-4] at 1.  At all times relevant hereto, Grutzmacher maintained an account with Facebook.  He was Facebook "friends" with employees of the Fire Department and other public safety agencies.

On the afternoon of Sunday, January 20, Buker was in his office at the Second Battalion at the Fire Department working and watching news coverage of the gun control debate.  [Document 28-16] at 1.  At 2:33 PM, Buker posted the following statement on his Facebook page:

> My aide had an outstanding idea . . lets (<u>sic</u>) all kill someone with a liberal . . . then maybe we can get them outlawed too! Think of the satisfaction of beating a liberal to death with another liberal . . . its (<u>sic</u>) almost poetic . . .

[Document 28-11] at 2; [Document 28-16] at 1.

Twenty minutes later, at 2:53 PM, Grutzmacher wrote the following comment on Buker's Facebook wall:

> But . . . was it an "assault liberal"? Gotta pick a fat one, those are the "high capacity" ones. Oh . . . pick a black one, those are more "scary".  Sorry had to perfect on a cool Idea!

[Document 28-11] at 3-4.

---

[6]    All dates herein are in the year 2013 unless otherwise indicated.

At 2:59 PM, Buker "liked" Grutzmacher's comment and posted the following statement: "Lmfao![7]  Too cool Mark Grutzmacher!" [Document 28-11] at 4.

### 3.   Reactions to the January 20 Facebook Posts

On January 22, First Battalion Chief Robert Utz sent a screenshot of Buker's initial Facebook post to Defendant Assistant Chief John Jerome ("Jerome") with a message stating: "Chief, not sure this is something that should be displayed from one of our battalion chiefs."  [Document 28-11] at 1.

Jerome forwarded the message to Anuszewski and Defendant Deputy Chief John S. Butler ("Butler").  [Document 28-12] at 1. Butler emailed the screenshot to Defendant Fire Chief William F. Goddard, III ("Goddard"), who responded "Let's make sure we snapshot their posts."  [Document 28-12] at 4.  Butler informed Goddard via email that "Many other inappropriate comments were made re Buker's posting, by others from within the [fire] dept. No one above the FF [firefighter] rank though."  [Document 28-12] at 4.

Members of the Phoenix Sentinels, the Howard County affiliate of the International Association of Black Professional Firefighters, contacted Battalion Chief Louis Winston ("Winston") after seeing the January 20 Facebook posts.  Winston

---

[7]     "Laughing my f***ing ass off."

Dep. 30:13-31:12.  Winston called Butler because a senior member of the Phoenix Sentinels had expressed concern that Grutzmacher's "comment of picking a black one referred to a black person."  Winston Dep. 30:15, 34:10-21.

On January 23, Buker removed the initial January 20 Facebook post from his Facebook page, which automatically removed all of the comments to that post, including Grutzmacher's comment. See [Documents 28-13, 28-14]; Grutzmacher Aff. ¶ 4.


### 4.   Termination of Grutzmacher's Volunteer Service

In a letter dated February 12, Anuszewski informed Grutzmacher that "you are hereby immediately dismissed from the County Volunteer program." [Document 28-22].  The letter did not give any further explanation for the dismissal.

Anuszewski testified at his deposition that Grutzmacher was dismissed "[f]or his postings on Facebook with racial overtones," which violated the Fire Department's "code of conduct, [and] social media policy."  Anuszewski Dep. 14:11-22. Goddard testified at his deposition that "Mr. Grutzmacher was terminated because of the – of his posting that I considered to be detrimental to the Howard County Department Fire and Rescue Services and the community that we serve."  Goddard Dep. 157:10-14.

Joseph Calo ("Calo"), Battalion Chief for the Administrative Services Bureau of the Fire Department, testified at his deposition that other factors influenced the decision to dismiss Grutzmacher as a volunteer.  Calo mentioned two past incidents when Grutzmacher's name "came up" – specifically, "issues at Clarksville" and "issues here [in Howard County] with radio reference."[8]  Calo Dep. 160:19-21.  He testified that with Grutzmacher's "name coming up a third time [in connection with the January 20 Facebook posts], the [fire] department just felt like it wasn't worth it[, so] the department made the decision to sever ties."  Id. 160:21-161:3.


B.   Legal Standard

Grutzmacher contends that the Defendants – specifically the Fire Department, Anuszewski, and Goddard – terminated his volunteer service in retaliation for his exercising his First Amendment right to free speech.

---

[8]    Grutzmacher was terminated from a volunteer position with the Clarksville, Maryland Fifth District Volunteer Department sometime between 2010 and 2011.  He testified at his deposition that he was informed his volunteer service there was terminated for "insubordination."  Grutzmacher Dep. 12:18-19, 13:14-16:7.  While Grutzmacher was a volunteer with the Fire Department, the Howard County Police Department approached the Fire Department with concerns about Grutzmacher possibly "using his position as a volunteer to get radio frequencies [and] posting the secure confidential radio frequencies" online.  Calo Dep. 158:12-159:9.  According to Grutzmacher, the frequencies he posted were public information that he got off of "the Federal Communications Web site that licenses frequencies."  Grutzmacher Dep. 17:3-9.

Speech by public employees receives less constitutional protection than speech by private citizens.[9]  See Garcetti v. Ceballos, 547 U.S. 410, 418 (2006).  However, "[s]o long as employees are speaking as citizens about matters of public concern, they must face only those speech restrictions that are necessary for their employers to operate efficiently and effectively."  Id. at 419.

To determine whether a public employee has stated a First Amendment claim for retaliatory discharge, a court must determine:

> (1)  whether the public employee was speaking as a citizen upon a matter of public concern or as an employee about a matter of personal interest;
>
> (2)  whether the employee's interest in speaking upon the matter of public concern outweighed the government's interest in providing effective and efficient services to the public; and
>
> (3)  whether the employee's speech was a substantial factor in the employee's termination decision.

McVey v. Stacy, 157 F.3d 271, 277-78 (4th Cir. 1998); see also Connick v. Myers, 461 U.S. 138, 147-48 (1983).

---

[9]  Although Grutzmacher was an unpaid volunteer, he is considered a public employee for purposes of his First Amendment retaliation claim.  Cf. Goldstein v. Chestnut Ridge Volunteer Fire Co., 218 F.3d 337, 356 (4th Cir. 2000) ("It also makes no difference that Goldstein was a volunteer fireman; he has been stripped of the powers, rights, and obligations heaped upon members of Chestnut Ridge.")

C.    McVey Prong #1 - Public Concern v. Personal Interest

The only speech relevant to Grutzmacher's claim occurred on January 20 and consists of: (1) Buker's initial post and (2) Grutzmacher's response.  Buker's "like" of, and response to, the Grutzmacher post does not constitute speech by Grutzmacher.

"The inquiry into the protected status of speech is one of law, not fact."  Connick, 461 U.S. at 148 n.7.  The employee bears the burden of demonstrating that he was speaking as a citizen[10] on a matter of public concern.  See Brooks v. Arthur, 685 F.3d 367, 371 (4th Cir. 2012).

"Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement . . . ."  Connick, 461 U.S. at 147-48.  The United States Courts of Appeals for the Fourth Circuit has stated:

> [T]he "public concern" or "community interest" inquiry is better designed—and

---

[10]    "Whether a statement is made as an employee or as a citizen is a question of law."  Graziosi v. City of Greenville Miss., 775 F.3d 731, 736 (5th Cir. 2015).  The Supreme Court has "h[e]ld that when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes."  Garcetti v. Ceballos, 547 U.S. 410, 421 (2006).  There is no evidence that making statements on Facebook was within the ordinary scope of Grutzmacher's duties as an EMT.  Moreover, the January 20 posts did not refer to any Fire Department practices or policies.  Accordingly, the Court holds that Grutzmacher's January 20 Facebook posts were speech as a citizen.  See Graziosi, 775 F.3d at 737; Duke v. Hamil, 997 F. Supp. 2d 1291, 1300 (N.D. Ga. 2014).

> more concerned—to identify a narrow spectrum
> of employee speech that is not entitled even
> to qualified protection than it is to set
> outer limits on all that is. The principle
> that emerges is that <u>all</u> public employee
> speech that by content is within the general
> protection of the first amendment is
> entitled to at least qualified protection
> against public employer chilling action
> except that which, realistically viewed, is
> of purely "personal concern" to the
> employee—most typically, a private personnel
> grievance.

<u>Berger v. Battaglia</u>, 779 F.2d 992, 998 (4th Cir. 1985).  Put

more simply, "'[s]peech involves a matter of public concern when

it involves an issue of social, political, or other interest to

a community.'  This does not include 'personal complaints and

grievances about conditions of employment.'"  <u>Durham v. Jones</u>,

737 F.3d 291, 299-300 (4th Cir. 2013) (citations omitted).

The content, form, and context of the January 20 Facebook

posts indicate that they were speech on a matter of public

concern – the gun control debate – and not private interest.

Whether they were intended as jokes[11] or as satire,[12] the

January 20 posts are vastly different from the unprotected

---

[11]    In a statement given during the Fire Department's
investigation, Buker wrote: "This joke occurred to me while
watching and working. . . . I fully, completely meant it as a
joke." [Document 28-16] at 1.  That Buker initially
characterized his post as a "joke" is relevant to whether the
post was speech on a matter of public concern, but it is not
necessarily dispositive.  <u>Cf. Shepherd v. McGee</u>, 986 F. Supp. 2d
1211, 1221 (D. Or. 2013) ("[W]hile the subjects of tax credits
or the use of government resources or entitlement programs are
arguably matters of public concern, Plaintiff's comments did not

speech present in the cases relied upon by Defendants.  For
instance, in Mitchell v. Hillsborough County, 468 F.3d 1276
(11th Cir. 2006), the Eleventh Circuit concluded that a county
employee's comments at a public meeting about a commissioner's
"'preoccupation with other women's vaginas'" was not speech on a
matter of public concern.  Id. at 1285.  The court explained
that "[c]omprised solely of sophomoric name-calling and
contempt-communicating expressive acts, there is nothing in the
content of Mitchell's speech that communicated anything of value
to a matter of public concern. Instead, content-wise, Mitchell's
speech, could only be viewed as a personal attack . . . ."  Id.

Moreover, the posts were not the kinds of jokes or pranks
that courts have found to be unprotected speech.  See, e.g.,
Robinson v. Jones, No. 3:02CV1470 (CFD), 2006 WL 726673, at *3

---

strike at the heart or core of the First Amendment given her own
characterization of them as 'humorous and ironic' and 'joke[s]'.
As such, they are more on the periphery of First Amendment
protection because they were banter rather than speech intended
to help the public actually evaluate the performance of a public
agency." (alteration in original) (internal citation omitted)).
[12]    Grutzmacher testified at his deposition that when he saw
Buker's initial post, "I took it as satire when I read it
initially.  I viewed it as a literal impossibility."
Grutzmacher Dep. 50:2-11.  He explained that he "took [the post]
to understand that . . . if they want to get things as the
liberal government, quote/unquote, banned because of something
silly like a cosmetic feature, then maybe we can get those
people banned for something silly as well."  Id. 51:2-14.  The
"use of satire to comment on a matter of public concern d[oes]
not deprive [an individual] of the protection afforded by the
first amendment."  See Muller v. Fairfax Cnty. Sch. Bd., 878
F.2d 1578, 1583 (4th Cir. 1989).

(D. Conn. Mar. 20, 2006) ("[The] 'speech' involved placing an election-related bumper sticker on Warden Brian Murphy's state car. . . . The Court finds that Robinson's joke or prank was personal in nature and does not qualify as protected public speech."); Martinez v. Del Re, No. 98 C 5841, 2001 WL 1104639, at *4-5 (N.D. Ill. Sept. 18, 2001) ("Absent any content that does not relate to matters of social or political import, and brought forth in the context of the 'Wall of Shame' and other lampoons, it cannot be fairly said that these postings address any topic of public concern.").

The January 20 Facebook posts differ in content, form, and context from other Facebook posts that courts have determined to be outside, or on the periphery of, First Amendment protection. In In re O'Brien, No. A-2452-11T4, 2013 WL 132508 (N.J. Super. Ct. App. Div. Jan. 11, 2013) (per curiam), the court agreed that a public school teacher's Facebook post stating "'I'm not a teacher—I'm a warden for future criminals!'" was not addressed to a matter of public concern, but instead was "a personal statement, driven by her dissatisfaction with her job and conduct of some of her students." Id. at *4. Similarly, in Shepherd v. McGee, 986 F. Supp. 2d 1211, (D. Or. 2013), the court stated that a Department of Human Services case worker's Facebook posts, including, inter alia, "'So today I noticed a Self-Sufficiency client getting into a newer BMW. What am I

14

doing wrong here? I think I need to quit my job and get on
[public assistance],'" were "more on the periphery of First
Amendment protection because they were banter rather than speech
intended to help the public actually evaluate the performance of
a public agency."  Id. at 1214-15;[13] see also Graziosi v. City of
Greenville Miss., 775 F.3d 731, 739 (5th Cir. 2015) ("[T]he
context weighs against a finding that she spoke on a matter of
public concern.  Graziosi made the [Facebook] posts immediately
after returning to work from an unrelated suspension.
Furthermore, when making the posts, she admits that she was
angry with Chief Cannon . . . and concedes that . . . her posts
were 'inappropriately intense.'").

    The January 20 Facebook posts rather closely resemble the
Facebook posts found to be protected speech in Duke v. Hamil,
997 F. Supp. 2d 1291 (N.D. Ga. 2014).  In Duke, a deputy chief
at a university police department was demoted after posting a
picture of the Confederate flag on Facebook and commenting
"'It's time for the second revolution'" shortly after the

---

[13]    But see Shepherd v. McGee, 986 F. Supp. 2d 1211, 1217 (D.
Or. 2013) ("The parties dispute whether Plaintiff's posts
constitute speech on a matter of public concern.  I need not
resolve that issue or whether Plaintiff spoke as a private
citizen or public employee because even assuming that the
Facebook posts were speech on a matter of public concern and
that Plaintiff spoke as a private citizen, I nonetheless grant
summary judgment to Defendant because he has shown as a matter
of law that DHS had an adequate justification for its
termination decision." (internal footnote omitted)).

conclusion of the 2012 presidential election.  Id. at 1293.  The

court concluded that the deputy's "speech can be fairly

considered to relate to matters of political concern to the

community because a Confederate flag can communicate . . .

various political or historical points of view.  Combine this

symbol with a statement calling for a revolution right after an

election, and it is plausible that Plaintiff was expressing his

dissatisfaction with Washington politicians." Id. at 1300.  The

court also emphasized that the deputy "expressed no grievances

related to the Department's policies or his colleagues."  Id.

Like the Facebook posts at issue in Duke, the January 20

posts constituted speech on a matter of public concern – the gun

control debate – and, more specifically, the proposed assault

weapons ban.  Buker wrote in his Fire Department statement that

he made the initial post after watching Sunday news coverage

concerning gun control, assault weapons, and gun violence.  See

[Document 28-16].  Just as the officer in Duke did not literally

want to start a revolution, Grutzmacher did not support

literally "beating a liberal to death with another liberal."

Moreover, other Fire Department employees expressed their

understanding that the January 20 posts were political

statements.  See, e.g., Bennett Dep. 63:10-13 ("[T]his was in

people's minds – First Amendment rights, Second Amendment

rights, social media policies, you know, all of those things

intertwined . . . ."); Breznak Dep. 21:2-3 ("I understood it was a political statement, yes."); Nally Dep. 57:5-9 ("Q : With respect to the Grutzmacher post, do you understand this to be a political statement?  A: Political in that it is specifically about gun control, yes.").

Even though the phrases "beating a liberal to death" and "black one, those are more 'scary'" may be offensive or distasteful, "[t]he inappropriate or controversial character of a statement is irrelevant to the question whether it deals with a matter of public concern."  Rankin v. McPherson, 483 U.S. 378, 387 (1987); see also Duke, 997 F. Supp. 2d at 1300.

The Court concludes that Grutzmacher's speech on January 20 was Grutzmacher speaking as a citizen on a matter of public concern and not as an employee about a matter of personal interest.


D.    McVey Prong #2 - Balancing Grutzmacher's Interest in
       Speech and Fire Department's Interest in Service

Once an employee demonstrates that his speech was on a matter of public concern, the court must balance "the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs

through its employees." Pickering v. Bd. of Ed. of Twp. High Sch. Dist. 205, Will Cnty., Ill., 391 U.S. 563, 568 (1968).

Defendants contend that, even if the January 20 Facebook posts involved matters of public concern, "the Fire Department's interest in minimizing disruption outweighed any minimal First Amendment interest [Grutzmacher] claim[s] to have in the[] Facebook posts." [Document 28-1] at 2.

"Whether the employee's interest in speaking outweighs the government's interest is a question of law for the court." Smith v. Gilchrist, 749 F.3d 302, 309 (4th Cir. 2014). "Regarding this balancing, the government bears the 'burden of justifying the discharge on legitimate grounds.'" Id., 749 F.3d at 309 (quoting Rankin v. McPherson, 483 U.S. 378, 388 (1987)).

The Pickering balancing test requires a court "to consider the context in which the speech was made, including the employee's role and the extent to which the speech impairs the efficiency of the workplace." Id. Factors relevant to this inquiry include whether a public employee's speech:

> (1) impaired the maintenance of discipline by supervisors;
>
> (2) impaired harmony among coworkers;
>
> (3) damaged close personal relationships;
>
> (4) impeded the performance of the public employee's duties;

    (5)  interfered with the operation of the
         institution;

    (6)  undermined the mission of the
         institution;

    (7)  was communicated to the public or to
         coworkers in private;

    (8)  conflicted with the responsibilities of
         the employee within the institution;
         and

    (9)  abused the authority and public
         accountability that the employee's role
         entailed.

Ridpath v. Bd. of Governors Marshall Univ., 447 F.3d 292, 317

(4th Cir. 2006).  The government employer is not required "to

prove that the employee's speech actually disrupted efficiency,

but only that an adverse effect was 'reasonably to be

apprehended.'"  Maciariello v. Sumner, 973 F.2d 295, 300 (4th

Cir. 1992) (citation omitted).  However, paying mere "lip

service," without "articulat[ing] any way in which the office

[environment] would have been different or was actually

different due to [a plaintiff's] statements," is not sufficient

to tip the scale in favor of the government employer.  See

Durham v. Jones, 737 F.3d 291, 302 (4th Cir. 2013).

    "The debate over the propriety of gun control legislation

is, obviously, a matter of public concern."  Thomas v. Whalen,

51 F.3d 1285, 1290 (6th Cir. 1995).  However, the Fourth Circuit

has stated that "fire departments[] provide such essential

services and depend so much on good working relations within the department that we place a premium on the government's interest as we conduct the _Pickering_ balancing test." _Mills v. Steger_, 64 F. App'x 864, 872 (4th Cir. 2003).

Defendants' reliance upon _Duke v. Hamil_, 997 F. Supp. 2d 1291 (N.D. Ga. 2014) for the proposition that "the heightened interest of a public safety agency" in promoting mutual respect, trust, and efficiency within the agency outweighs an employee's interest in posting comments on Facebook, [Document 28-1] at 31-32, is misplaced.  Unlike the plaintiff in _Duke_, Grutzmacher was not in management, but was, in contrast, merely an unpaid volunteer EMT.  _Cf._ _McClernon v. Beaver Dams Volunteer Fire Dep't, Inc._, 489 F. Supp. 2d 291, 296 (W.D.N.Y. 2007) (finding that former volunteer fire department chief's "speech was damaging to the Department and detrimental to the functioning of the Department").  In fact, Anuszewski testified at his deposition that volunteers are not part of the formal chain of command and, therefore, they cannot advance within the Fire Department. Anuszewski Dep. 12:25-13:3.

The evidence of purportedly potentially adverse effects on the efficiency of the Fire Department on which Defendants seek to rely, while pertinent to Buker, is essentially meaningless as to Grutzmacher.  _See, e.g._, [Document 28-11] at 1 (email from First Battalion Chief Robert Utz to Goddard stating "Chief, not

sure this is something that should be displayed from one of our battalion chiefs."); [Document 28-8] at 8-9 (Deposition of Lt. Bruce Bennett, 60:18-61:3, "[A]ny disruption?  Well, it was like a whirlwind.  Hey, you know, Chief Buker, did you see the post? . . . [W]hen Chief Buker was sent up to the office and everyone was, like, oh, what's going to happen to Chief Buker . . . ."); [Document 28-29] at 7 (Deposition of Battalion Chief Winston, 34:10-25, testifying that an African-American Lieutenant "had concerns with having to work for [Buker]").  Moreover, in an email exchange with Goddard, Butler appeared to downplay the involvement of anyone other than Buker, writing "[m]any other inappropriate comments were made re Buker's posting, by others from within the [fire] dept.  No one above the FF [firefighter] rank though."  [Document 28-12] at 4.

Defendants have presented "no relevant facts upon which [they] could base an argument that [Grutzmacher]'s interest in speaking as a private citizen on matters of public concern was outweighed by the [Fire Department's] interest in providing effective and efficient services to the public."  Smith, 749 F.3d at 312.

The Court concludes that the Pickering balancing tests tips in favor of Grutzmacher's interest in speaking about the gun control debate.  Accordingly, Defendants are not entitled to summary judgment on the basis of the Pickering balancing test.

E.    McVey Prong #3 – Substantial Factor in Termination of
Grutzmacher's Volunteer Service

If the court determines that an employee's interest in
speaking on a matter of public concern outweighs the employer's
interest in providing efficient service, then "the court turns
to the factual question of 'whether the employee's speech was a
substantial factor in the employee's termination decision.'"
Brooks, 685 F.3d at 371.   The employee bears the burden of
demonstrating the causal relationship.   Ridpath, 447 F.3d at
318.

Defendants contend that "assuming for the sake of argument
that [Grutzmacher] could succeed" under the first two prongs of
the McVey test, they "are still entitled to summary judgment
under the third prong, requiring proof by [Grutzmacher] that
[his] protected speech was the 'but for' cause of" the
termination of his volunteer service.   [Document 28-1] at 40.

"The causation requirement is 'rigorous' in that the
protected expression must have been the 'but for' cause of the
adverse employment action . . . ."   Ridpath v. Bd. of Governors
Marshall Univ., 447 F.3d 292, 318 (4th Cir. 2006); see also
Jurgensen v. Fairfax Cnty., Va., 745 F.2d 868, 881 (4th Cir.
1984).   However, "[t]he employer may nevertheless rebut the
showing [that the protected speech was a substantial factor in

22

the termination] by proof that it would have discharged the
plaintiff 'even in the absence of the protected conduct.'"
Stroman v. Colleton Cnty. Sch. Dist., 981 F.2d 152, 156 (4th
Cir. 1992) (quoting Mount Healthy City Bd. of Educ. v. Doyle,
429 U.S. 274, 287 (1977).

In their Reply brief, Defendants stated – "As to Mr.
Grutzmacher, an at-will Fire Department volunteer, there is no
dispute that he was notified that 'his services were no longer
needed' after his 'black . . . scary' Facebook post."
[Document 31] at 14.  Defendants argue that Grutzmacher has
failed to contradict Goddard's deposition testimony that his
volunteer service was terminated because his "name 'had surfaced
on [his] desk' twice within a short period of time."  Id.
(alteration in original).  However, Goddard actually testified
that:

> I thought that clearly [Grutzmacher] was in
> violation of the – the departmental policies
> in respect to the use of social media and
> that here was two times within a short
> period of time that his name once again had
> surfaced as – on my desk, that I thought
> that it was in the best interest of the
> department that I let him go.

Goddard Dep. 343:12-22 (emphasis added).  Moreover, earlier in
his deposition, Goddard testified expressly that:

> Mr. Grutzmacher was terminated because of
> the – of his posting . . . .
>
>          . . . .

> Mr. Grutzmacher was terminated for a number
> of reasons.  Social media policy was
> certainly taken into consideration.  Code of
> conduct was taken into consideration.

Id. 157:10-20 (emphasis added).

Other Fire Department employees testified similarly at their depositions that Grutzmacher's volunteer service was terminated because of the January 20 Facebook posts.  See Anuszewski Dep. 14:11-15 ("Q: Do you know why he was dismissed as a county volunteer?  This is Mr. Grutzmacher.  A: I do. . . . For his postings on Facebook . . . ."); Calo Dep. 160:18-22 ("[Grutzmacher] made a clear racial comment and it spoke for itself.  And . . . now his name coming up a third time [with the Facebook posts], the department just felt like it wasn't worth it . . . .").

The evidence, including the testimony of Fire Department employees, is adequate to permit a reasonable jury to find the January 20 Facebook posts were a substantial factor in the decision to terminate Grutzmacher's volunteer service.[14]

---

[14]   The fact that the January 20 Facebook posts incident was the third time that Grutzmacher's name "came up," while perhaps relevant to establish that there were other factors pertinent to Grutzmacher's termination, by no means definitively establishes that the posts were not a substantial factor in the termination of his volunteer service or that his service would have been terminated even if the January 20, 2013 Facebook incident had not occurred.

Accordingly, Defendants are not entitled to summary judgment on Grutzmacher's retaliation claim.


IV.  <u>CONCLUSION</u>

The instant Memorandum Decision sets forth the reasons that Defendants' Motion for Summary Judgment [Document 28] was DENIED as to Plaintiff Grutzmacher.


SO ORDERED, on <u>Wednesday, May 27, 2015</u>.


_____/s/_____
Marvin J. Garbis
United States District Judge
